UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                       :

CIPCIAO, LLC,                               :

                       Plaintiff,          :

                                         :              20-CV-5982 (JMF)

            -v-                 :

                                       :              <u>OPINION AND ORDER</u>

M CHOW ONE, LLC and MICHAEL CHOW,    :

                                       :

                    Defendants.      :

                                       :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In January 2020, Cipciao, LLC ("Cipciao"), a restaurant acquisition company, entered

into a written agreement with M Chow One, LLC ("MCO") to purchase a controlling

membership interest in the chain of upscale Chinese restaurants doing business as "Mr. Chow,"

which MCO owns.  As part of the deal, Cipciao paid a "non-refundable" $5 million payment to

MCO.  Thereafter, however, the deal fell apart; indeed, both parties now purport to have

terminated their agreement.  Not surprisingly perhaps, Cipciao now wants its $5 million back.

To that end, it brings a breach of contract claim and a constructive trust claim against MCO.  It

also brings claims against Michael Chow, MCO's principal.  Each Defendant now moves,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss.  For the reasons

that follow, both motions are granted, and Cipciao's claims are dismissed in their entirety.

**BACKGROUND**

The following facts — drawn from the Complaint and documents attached to, integral to, or incorporated by reference in it — are assumed to be true for purposes of these motions. *See, e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

On January 31, 2020, Cipciao and MCO entered into a written agreement (the "Purchase Agreement"), pursuant to which Cipciao agreed to purchase from MCO a 90% interest in MCO — which owns all Mr. Chow restaurants and the licensing rights to the "Mr. Chow" name — for $68 million.  ECF No. 1-1 ("Compl."), ¶¶ 17-19; *see* ECF No. 13-4 ("Agreement").  Chow, who controls MCO, *see* Compl. ¶ 3, was not a party to the Purchase Agreement.  Section 2.1(a) of the Purchase Agreement required Cipciao to pay MCO a "good faith non-refundable payment (subject to Section 8.2(b))" of $5 million dollars (the "Initial Payment") "to demonstrate [Cipciao's] good faith pursuit of the transactions contemplated by [the] Agreement and as evidence of the availability" to Cipciao of funds sufficient to satisfy the full purchase price. Compl. ¶¶ 19-20; Agreement § 2.1(a).  Cipciao satisfied the Initial Payment.  Compl. ¶ 21. According to the Complaint, MCO then transferred the Initial Payment to Chow.  *Id.* ¶ 50.

The parties' obligations to close the transaction were contingent upon conditions set forth in Article VII of the Purchase Agreement.  To the extent relevant here, Cipciao's obligation to close was contingent upon MCO's obtaining the consent of certain leaseholders to Mr. Chow restaurants (the "Restaurant Lease Consents"), which were identified in a Schedule to the Purchase Agreement.  *Id.* ¶¶ 22-25; *see* Agreement § 7.2(b) ("The obligations of [Cipciao] to consummate the transactions contemplated hereby are subject to the satisfaction or waiver in writing by [Cipciao] at or prior to the Closing of the following condition[]: . . . All Consents required under the Restaurant Leases set forth on Schedule 7.2(b) shall have been obtained.").  Additionally, the first Covenant set forth in Article VI of the Purchase Agreement required "each

2

[p]arty [to] use its reasonable best efforts to obtain, at the earliest practicable date, all Consents necessary in connection with the consummation of the transactions contemplated under this Agreement or any Ancillary Document prior to the Closing."  Agreement § 6.1.

The Purchase Agreement also provided for termination in various ways, two of which are relevant here.  First, Section 8.1(b) provided for termination by either party,

> upon written notice to the other [p]arty, if any of the conditions to such [p]arty's obligations to consummate the transactions contemplated by this Agreement under Section 7.1, Section 7.2 or Section 7.3, as applicable, shall not have been satisfied (or waived in writing by such [p]arty) on or before May 18, 2020 . . . provided, that if any such condition is not satisfied as a result of a breach by any [p]arty of its representations, warranties, covenants or agreements contained in this Agreement, then the [p]arty responsible for such breach shall not have the right to terminate this Agreement pursuant to this Section 8.1(b).

Agreement § 8.1(b).  Stated more simply, Section 8.1(b) permitted *either* party to terminate the Purchase Agreement if any closing condition was not satisfied (so long as the condition was not unsatisfied because of the terminating party's breach of its *own* warranties, covenants, or agreements).

Second, Section 8.1(c) provided for termination by Cipciao,

> upon written notice to [MCO], if there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by [MCO] pursuant to this Agreement that would give rise to the failure of any of the conditions set forth in Section 7.2, and such breach, inaccuracy or failure is incapable of being cured by [May 18, 2020] or, if capable of being cured, remains uncured for more than 10 days after [Cipciao] shall have given written notice thereof to [MCO]; provided, that there is not then a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by [Cipciao] pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 7.3 . . . .

*Id.* § 8.1(c).  Stated more simply, Section 8.1(c) permitted *Cipciao* to terminate the Purchase Agreement if MCO had breached any of its obligations under the Purchase Agreement *and* that breach would give rise to the failure of a condition on Cipciao's obligation to close (so long as Cipciao had not breached any of its own obligations under the Purchase Agreement that would

give rise to the failure of a condition on MCO's obligation to close and the breach was incurable

or had not been cured within ten days of written notice).

The "procedures and effect[s] of termination" were described in Section 8.2 of the

Purchase Agreement. *Id.* § 8.2 (capitalization altered). To the extent relevant here, Section

8.2(b) provided for the return of Cipciao's Initial Payment under the following circumstances:

> In the event (i) all conditions to the [p]arties' obligations to close set forth in
> Section 7.1, Section 7.2 and Section 7.3 (as applicable) have been satisfied (other
> than any such conditions which by their nature are to be satisfied by the Closing
> Date) or waived except for the conditions set forth in Section 7.2(b) and Section
> 7.3(b), and (ii) this Agreement is terminated by [Cipciao] pursuant to Section
> 8.1(c) as a result of the failure to satisfy the closing condition set forth in Section
> 7.2(b), then [MCO] shall promptly repay the [Initial Payment] to [Cipciao].
> Notwithstanding anything to the contrary herein, in the event this Agreement is
> terminated by any [p]arty in accordance with Section 8.1 (other than such
> termination by [Cipciao] under Section 8.1(c) described in the immediately
> preceding sentence of this Section 8.2(b)), [MCO] shall be entitled to retain the
> entire [Initial Payment].

*Id.* § 8.2 (b). That is, subject to certain exceptions not relevant here, Cipciao was entitled to the

return of its Initial Payment *if and only if* (1) the Restaurant Lease Consents were not obtained by

the closing date and (2) Cipciao terminated the Purchase Agreement under Section 8.1(c).

It is undisputed that MCO failed to obtain the Restaurant Lease Consents by the closing

date. Compl. ¶ 29; ECF No. 15 ("MCO's Mem."), at 5. Thus, on the evening of May 18, 2020,

Cipciao sent MCO a termination letter. Compl. ¶ 33. The letter stated: "Given that this

Termination arises from [MCO's] failure under Section 7.2(b) of the [Purchase Agreement],

[MCO] is required to promptly repay the [Initial Payment] to [Cipciao]." *Id.* One week later,

MCO responded with a termination letter of its own, citing Cipciao's failure to obtain financing

for the purchase. *Id.* ¶ 39. "Therefore," MCO wrote, it was "retaining the entire [Initial

Payment] under Section 8.2." *Id.*

On June 3, 2020, Cipciao filed this action in New York State Supreme Court, alleging

breach of contract and constructive trust claims against MCO and constructive trust, constructive

voidable transfer, actual fraudulent transfer, constructive fraudulent conveyance, actual fraudulent conveyance, and unjust enrichment claims against Chow. *See* Compl. ¶¶ 58-118. All claims are brought under New York law. *See id.* ¶ 14 (citing Agreement § 11.4). Defendants removed the action to this Court based on diversity of citizenship and now move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF Nos. 1, 11, 14.

## LEGAL STANDARDS

In evaluating a Rule 12(b)(6) motion, a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

As noted, Cipciao brings a breach of contract claim against MCO and various equitable and statutory claims against both MCO and Chow. The Court will address each in turn.

### A. The Breach of Contract Claim

Cipciao's central claim is that MCO breached Section 8.2(b) of the Purchase Agreement by refusing to return Cipciao's Initial Payment following Cipciao's termination. A court may

dismiss a breach of contract claim on a Rule 12(b)(6) motion if the contract is materially
unambiguous.  *See, e.g., Advanced Mktg. Grp., Inc. v. Bus. Payment Sys., LLC*, 300 F. App'x 48,
49 (2d Cir. 2008) (summary order); *see also, e.g.*, *Rounds v. Beacon Assocs. Mgmt. Corp.*, No.
09-CV-6910 (LBS), 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) ("Where there is no
ambiguity to a contract and the intent of the parties can be determined from the face of the
agreement, interpretation is a matter of law, and a claim turning on that interpretation may be
resolved on a motion to dismiss." (internal quotation marks omitted)).  A contract is
unambiguous when it has "a definite and precise meaning, unattended by danger of
misconception in the purport of the contract itself, and concerning which there is no reasonable
basis for a difference of opinion."  *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir.
2012) (internal quotation marks omitted).  By contrast, "ambiguity exists where a contract term
could suggest more than one meaning when viewed objectively by a reasonably intelligent
person who has examined the context of the entire integrated agreement and who is cognizant of
the customs, practices, usages and terminology as generally understood in the particular trade or
business."  *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir.
2012) (internal quotation marks omitted).  "The language of a contract is not made ambiguous,"
however, "simply because the parties urge different interpretations."  *O.D.F. Optronics Ltd. v.
Remington Arms Co.*, No. 08-CV-4746 (DLC), 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26,
2008) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).
"The matter of whether the contract is ambiguous is a question of law for the court."  *L.
Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010).

Applying these principles here, the Court concludes that the Purchase Agreement
unambiguously bars Cipciao's contract claim for return of the Initial Payment.  Significantly, the
one and only provision of the Purchase Agreement that provides for refund of the Initial Payment

is Section 8.2(b).  But as noted, that Section requires the satisfaction of two conditions: first, that the Restaurant Lease Consents were not obtained by the closing date *and*, second, that Cipciao validly terminated the Purchase Agreement "pursuant to Section 8.1(c) as a result of the failure to satisfy the closing condition set forth in Section 7.2(b)."  It is undisputed that the first condition was met: MCO failed to obtain the Restaurant Lease Consents by the closing date.  But the second condition was not, because Cipciao did not validly terminate the Purchase Agreement pursuant to Section 8.1(c).  After all, that provision applied if and only if there was (1) "a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by [MCO] pursuant to this Agreement" *and* (2) that breach, inaccuracy, or failure to perform "*would*," in turn, "*give rise to* the failure of any conditions set forth in Section 7.2."  Agreement § 8.1(c) (emphasis added).  Here, Cipciao alleges the failure of a condition set forth in Section 7.2, but it does not allege "a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by" MCO.

In fact, Cipciao explicitly concedes the opposite in its memorandum of law: that it "is claiming a failure of an express condition precedent to its obligation to close[,] . . . *not that MCO breached the* [*Purchase Agreement*] *by failing to obtain the Consents*."  ECF No. 20 ("Pl.'s Opp'n to MCO's Mot."), at 15 (emphasis added); *see id.* at 1 (admitting that Cipciao "does not contend that, by failing to procure the consents, MCO breached [the Purchase Agreement]").  Along similar lines, Cipciao goes so far as to label MCO's argument that it (MCO) never breached the Purchase Agreement "a non-sequitur."  *Id.* at 15.  It is anything but a non-sequitur.  Under the plain language of the Purchase Agreement, the failure of MCO to obtain the Restaurant Lease Consents alone — even though a condition of closing — did not give Cipciao the right to terminate under Section 8.1(c) and, by extension, the right to return of the Initial Payment under Section 8.2(b).  Put differently, Cipciao's failure to allege a breach, inaccuracy,

or failure to perform that would, in turn, cause the failure of a closing condition is fatal to its claim that MCO breached the Purchase Agreement by refusing to return the Initial Payment.

Cipciao urges a different reading of the Purchase Agreement, one pursuant to which MCO was "obligat[ed] to return [Cipciao's] $5,000,000 Initial Payment for its failure to satisfy closing conditions in Section 7.2(b)" alone.  Pl.'s Opp'n to MCO's Mot. 14.  But such a reading must be rejected because it would render substantial portions of the Purchase Agreement superfluous.  *See, e.g.*, *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) (holding that "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible" (cleaned up)).  First and foremost, Cipciao's interpretation would read out of Section 8.1(c) the clause requiring "a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by [MCO] pursuant to this Agreement that would give rise to . . . ."  Agreement § 8.1(c). Additionally, it would render superfluous Section 8.1(c) in its entirety and thus undermine the parties' intent to curtail the circumstances in which Cipciao would be entitled to return of the Initial Payment under Section 8.2(b).  Section 8.1(b), after all, gave Cipciao the right to walk away from the closing based on nothing more than the fact that MCO had failed to obtain the Restaurant Lease Consents; it did not need to separately prove "a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement."  In short, because Cipciao's interpretation of the Purchase Agreement renders portions of the Purchase Agreement superfluous, it must be rejected as a matter of law.

Cipciao also argues that its reading of the Purchase Agreement should be adopted so as to avoid "absurd and commercially unreasonable" results.  *See* Pl.'s Opp'n to MCO's Mot. 16 (citing, *inter alia*, *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11-CV-8440 (PAC), 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012), *aff'd*, 513 F. App'x 109 (2d Cir. 2013) (summary

order)).  In particular, Cipciao contends that it would be absurd to permit MCO to retain

Cipciao's Initial Payment because, without the Restaurant Lease Consents, "the [Mr. Chow]

enterprise would not be able to continue to occupy the restaurant space, and [Cipciao] would not

receive the benefit of its $68 million bargain."  *Id.* (emphasis omitted).  That argument might

have had some traction if the natural reading of the Purchase Agreement required Cipciao either

to close on the deal or to pay the full $68 million without regard for the Restaurant Lease

Consents.  But it did not.  The absence of the Restaurant Lease Consents, without more,

permitted Cipciao to terminate the Purchase Agreement — and, by extension, to avoid paying the

remainder of the purchase price —pursuant to Section 8.1(b).  But it did not permit termination

pursuant to Section 8.1(c) — the only provision that allowed for return of its "good faith *non-*

*refundable*" $5 million deposit.  Agreement § 2.1(a) (emphasis added).  There is nothing

commercially absurd or unreasonable about a contract that provides for a non-refundable deposit

amounting to a fraction of the total value of a transaction negotiated by sophisticated,

commercial entities — let alone sufficiently absurd to justify disregarding the plain meaning of

the parties' written agreement under New York law.  *See Warberg Opportunistic Trading Fund,*

*L.P. v. GeoResources, Inc.*, 973 N.Y.S.2d 187, 192 (1st Dep't 2013) ("[T]he [New York] Court

of Appeals has set a high bar for declaring a contract absurd." (citing cases)).

Perhaps sensing that its reading of the Purchase Agreement may not be the better one,

Cipciao argues in the alternative that MCO did indeed "fail[] to meet [its] obligation" to "use its

'reasonable best efforts to obtain, at the earliest practicable date, all necessary Consents,'" and

thus breached or failed to perform an obligation that, in turn, gave rise to the failure of the

closing condition in Section 7.2(b) of the Purchase Agreement.  Pl.'s Opp'n to MCO's Mot. 18

(emphasis omitted) (quoting Agreement § 6.1).  The problem with this argument is that no such

allegations appear in the Complaint and "it is well-settled that a claim for relief may not be

amended by the briefs in opposition to a motion to dismiss." *Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *17 (S.D.N.Y. Mar. 26, 2020) (cleaned up).  In its opposition memorandum, Cipciao points to Paragraph 31 of the Complaint, which alleges that, for "certain" unspecified leases, "[Cipciao] was aware of no communication or progress whatsoever to obtain the requisite Consents."  Compl. ¶ 31; *see* Pl.'s Opp'n to MCO's Mot. 18. But alleging that *Cipciao* was not *aware* of a communication (or progress) is not the same as alleging that no such communication occurred, let alone the same as alleging that MCO failed to use its "reasonable best efforts to obtain, at the earliest practicable date," all of the Restaurant Lease Consents, which is what would actually constitute a breach.  Agreement § 6.1.  "If anything, therefore," Cipciao's memorandum "serve[s] only to illustrate the deficiencies in" the Complaint.  *Rincon v. Covidien*, No. 16-CV-10033 (JMF), 2017 WL 2242969, at *2 (S.D.N.Y. May 22, 2017).

    In one final, perhaps even more desperate attempt to avoid dismissal, Cipciao proffers an alternative theory of breach in a letter-motion filed almost four months after briefing was complete.  *See* ECF No. 28 ("Supp. Ltr.").  Under Section 4.12(b) of the Purchase Agreement, Cipciao notes, MCO represented that "all of the real property leases to which any Acquired Company is a party ('Leases') are in full force and effect and enforceable by the Acquired Company."  And Section 7.2(a) provided that all of "[MCO]'s representations contained in . . . Article IV," including Section 4.12(b) "shall be true and correct in all respects as of the Closing Date as if made on the Closing Date."  According to Cipciao, "[i]t is undisputed that, by virtue of the Lease provisions making the transfer of the 90% Interest a default thereunder absent the requisite Consents, none of the Leases would in fact remain 'enforceable by the Acquired Companies [i.e., the tenants]' on the Closing Date."  Supp. Ltr. 2.  "As such," Cipciao continues, "even if MCO's readings of the both the [Purchase Agreement] and Complaint are correct —

that a failure of a condition to closing took place without a failure to perform by MCO being

adequately alleged . . . — [Cipciao] still prevails because, in all events, MCO has 'failed to

perform any representation' and that is all that is required under the express terms of section

8.1(c) to permit [Cipciao] to terminate and receive a refund of its deposit." *Id.*

There are so many problems with this argument it is hard to know where to start.  First, it

did not appear in Cipciao's memorandum of law and, thus, was forfeited.  *See, e.g.*, *Johnson &

Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 359 (S.D.N.Y. 2007) (Lynch, J.) (noting that

arguments first raised in letters submitted after all other motion papers have been filed are "not

properly considered" (internal quotation marks omitted)); *see also, e.g.*, *United States v.

Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) ("[I]t is well-settled that we will not usually entertain

an argument made for the first time in a reply brief.").  Second, none of the allegations on which

it is based appear anywhere in the Complaint and it is far from clear that the relevant facts are

"undisputed."  (Among other things, "Acquired Company" is a defined term in the Purchase

Agreement, and the "Leases" referenced in Section 4.12(b) are listed in Schedule 4.12.  *See*

Agreement § 4.12(a).  Thus, these "Leases" do not appear to be the same as the "Restaurant

Leases" referenced in Section 7.2(b) and listed in Schedule 7.2(b).)  Third, there is no indication

— in the Complaint or elsewhere — that Cipciao provided "written notice" of this theory of

breach to MCO, as required by Section 8.1(c) of the Purchase Agreement.  And finally, Section

8.2(b) mandated return of the Initial Payment if and only if Cipciao validly terminated the

Purchase Agreement "pursuant to Section 8.1(c) *as a result of the failure to satisfy the closing

condition set forth in Section 7.2(b)*."  Agreement § 8.2(b) (emphasis added).  Thus, even if

Cipciao were correct and the condition set forth in *Section 7.2(a)* was not satisfied by the closing

date, that would not entitle Cipciao to return of the Initial Payment.  In short, Cipciao's post hoc

argument based on Sections 4.12(b) and 7.2(a) is both too little and too late.

In short, Cipciao fails to allege that it validly terminated the Purchase Agreement pursuant to Section 8.1(c).  It follows that it is not entitled to return of the Initial Payment pursuant to Section 8.2(b) and that its breach claim against MCO must be dismissed.

**B.  Unjust Enrichment and Constructive Trust Claims**

Next, Cipciao brings an unjust enrichment claim against Chow and constructive trust claims against both MCO and Chow.  Compl. ¶¶ 74-81, 113-18.  The claims against Chow are premised on the allegation that MCO transferred the Initial Payment, in whole or in part (the Complaint does not specify), to Chow.  *See id.* ¶¶ 50, 79, 114-15.  The claim against MCO appears to be based on the possibility that it retained at least a portion of the Initial Payment for itself.  *See id.* ¶ 79.

The standards relevant to these claims overlap in material ways.  First, to state a claim for unjust enrichment under New York law, a plaintiff must allege "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (Sotomayor, J.) (quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)); *see IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("An unjust enrichment claim rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." (internal quotation marks omitted)).  Second, "[u]nder New York law, a constructive trust is only imposed upon a finding of (1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment."  *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (internal quotation marks omitted).  "The fourth element is the most important since 'the purpose of the constructive trust is prevention of unjust enrichment.'"  *Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 212 (2d Cir. 2004) (quoting *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978)).  Thus, "[u]nder

New York law, a constructive trust will not be imposed absent a finding of unjust enrichment." *Turner v. Temptu Inc.*, No. 11-CV-4144 (JMF), 2013 WL 4083234, at *10 n.3 (S.D.N.Y. Aug. 13, 2013) (citing *In re First Cent. Fin. Corp.*, 377 F.3d at 212), *aff'd*, 586 F. App'x 718 (2d Cir. 2014) (summary order).

In light of these standards, Cipciao's claims are easily rejected.  Put simply, given MCO's contractual entitlement to the Initial Payment (and Chow's controlling stake in MCO), Cipciao fails to allege any facts suggesting that equity demands return of the Initial Payment from either MCO or Chow.  The closest the Complaint comes is in alleging that Chow used the Initial Payment to "fund[] his lavish lifestyle."  Compl. ¶ 3.  But that allegation falls far short of the standard.  *See, e.g.*, *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 218 (S.D.N.Y. 2019) ("The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." (quoting *Paramount Film Distrib. Corp. v. State*, 285 N.E.2d 695, 698 (N.Y. 1972)); *He v. Apple, Inc.*, 139 N.Y.S.3d 409, 412 (3d Dep't 2020) ("[T]here is nothing inherently inequitable in . . . making money from a legitimate transaction.").  Cipciao's constructive trust claim against MCO fails for a second, independent reason.  Under New York law, the existence of a valid and enforceable written contract generally precludes recovery on either an unjust enrichment or a constructive trust theory against another party to the contract.  *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)) (unjust enrichment); *In re First Cent. Fin. Corp.*, 377 F.3d at 213 (constructive trust); *see also, e.g.*, *Philip Morris Cap. Corp. v. Nat'l R.R. Passenger Corp.*, No. 19-CV-10378 (JMF), 2021 WL 797671, at *7 (S.D.N.Y. Feb. 26, 2021) (unjust enrichment); *Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15-CV-7425 (JSR), 2017 WL 4350576, at *6 (S.D.N.Y. May 3, 2017) (unjust enrichment and

constructive trust); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 296-97 (S.D.N.Y.

2015) (unjust enrichment); *Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d

502, 514-15 (S.D.N.Y. 2012) (unjust enrichment and constructive trust).  Here, there is no

dispute that a valid and enforceable contract between Cipciao and MCO governs the question of

which party is entitled to retain Cipciao's Initial Payment.  Cipciao's constructive trust claim

against MCO thus fails as a matter of law.

**C.  Fraudulent Conveyance and Transfer Claims**

    Finally, Cipciao brings claims against Chow (and Chow alone) for constructive

fraudulent conveyance and actual fraudulent conveyance under the New York Debtor & Creditor

Law ("D.C.L."), for any transfers of funds that occurred on or before April 3, 2020; and for

constructive voidable transfer and actual fraudulent transfer under the Uniform Voidable

Transactions Act ("U.V.T.A."), for any transfers that occurred on or after April 4, 2020.  Compl.

¶¶ 100-12.[1]  The distinction is due to the effective date of the latter.  On December 6, 2019, the

New York legislature repealed all relevant sections of the D.C.L. and replaced them with the

U.V.T.A., effective April 4, 2020.  *See Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. 2020)

(summary order) (citing 2019 N.Y. Sess. Laws ch. 580 (McKinney)); *Varbero v. Belesis*, No. 20-

CV-2538 (LJL), 2020 WL 5849516, at *5 & n.1 (S.D.N.Y. Oct. 1, 2020).[2]  Thus, the U.V.T.A.

applies to any "transfer made or obligation incurred" on or after its effective date of April 4,

---

[1]  Although Cipciao fails to specify the sections of either statute under which it brings its claims, the Court presumes that they arise under Sections 273, 274, 275, and 276 of the D.C.L. and Sections 273(a)(2), 274(a) and 274(b) of the U.V.T.A., in part because Cipciao cites or discusses these sections in its memorandum of law.  *See* ECF No. 21 ("Pl.'s Opp'n to Chow's Mot."), at vi, 11-12.

[2]  Strictly speaking, the U.V.T.A. is codified at chapter 12, article 10, of the New York Debtor & Creditor Law.  But for clarity, the Court refers to the earlier version of the statute as the "D.C.L." and the current version as the "U.V.T.A."

2020. *Ray*, 799 F. App'x at 31 n.1 (summary order) (quoting 2019 N.Y. Sess. Laws ch. 580 (McKinney)).

The precise timing of the alleged transfer or transfers of funds from MCO to Chow is ultimately immaterial because Cipciao is not a proper plaintiff under either version of the statute. Broadly speaking, New York fraudulent transfer law "codifies a set of legal principles that are intended to protect creditors by invalidating certain transactions that render debtors' assets unreachable." *Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 302 B.R. 760, 778 (E.D.N.Y. 2003) (internal quotation marks omitted), *aff'd*, 403 F.3d 43 (2d Cir. 2005). To that end, the relevant provisions of both the D.C.L. and U.V.T.A. provide causes of action to "a [c]reditor," defined (by the U.V.T.A.) as "a person that has a claim," which is defined, in turn, as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." N.Y. Debt. & Cred. Law §§ 270(c), (d); *accord* D.C.L. § 270 (defining a "[c]reditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent"); *see* N.Y. Debt. & Cred. Law § 273(a) ("A transfer made or obligation incurred by a debtor [may be] voidable *as to a creditor*, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred . . . ." (emphasis added)); *id.* §§ 274(a), (b) (establishing a cause of action for "*a creditor* whose claim arose before the transfer was made or the obligation was incurred" (emphasis added)); D.C.L. §§ 273-276 (establishing causes of action for "*creditors*," "*creditors* and . . . other persons who *become creditors* during the continuance of such business or transaction," and "*present and future creditors*" (emphases added)). Cipciao, however, fails to plausibly allege that it is or was a creditor of either MCO or Chow within the meaning of either version of the statute. That is, given Cipciao's lack of entitlement to return of its Initial Payment under the Purchase

Agreement, it never had any choate or inchoate right to payment from MCO.  It follows that any conveyance from MCO to Chow could not have been fraudulent as to Cipciao and that Cipciao's D.C.L. and U.V.T.A. claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, both Defendants' motions to dismiss are GRANTED in full. The Court need not and does not reach Defendants' alternative arguments for dismissal.

Additionally, the Court declines to grant Cipciao leave to amend its Complaint *sua sponte*.  Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is ultimately "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Here, Cipciao does not request leave to amend or suggest that it is in possession of facts that would cure the problems with its claims.  *See, e.g.*, *Fischman v. Mitsubishi Chem. Holdings Am., Inc.*, No. 18-CV-8188 (JMF), 2019 WL 3034866, at *7 (S.D.N.Y. July 11, 2019) (declining to grant leave to amend as to certain claims in the absence of any suggestion that additional facts could remedy defects in the plaintiff's pleading).  Additionally, the Court granted Cipciao leave to amend its Complaint in response to Defendants' motions to dismiss, but Cipciao did not take this opportunity.  In granting leave to amend, the Court explicitly warned that Cipciao would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF No. 17.  In light of these circumstances, the Court will not *sua sponte* grant leave to amend.  *See, e.g., Overby v. Fabian*, No. 17-CV-3377 (CS), 2018 WL 3364392, at *14 (S.D.N.Y. July 10, 2018) ("Plaintiff's failure to fix deficiencies in his . . . pleading, after being provided ample notice of them, is alone sufficient ground to deny leave to amend *sua sponte*.").

The Clerk of Court is directed to terminate ECF Nos. 11 and 14, to enter judgment for

Defendants, and to close this case.

SO ORDERED.

Dated: March 24, 2021
        New York, New York

_____
                JESSE M. FURMAN
        United States District Judge